Filed 12/26/24

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| ALLIANCE MARC & EVA STERN MATH AND SCIENCE HIGH SCHOOL et al.,<br><br>Petitioners,<br><br>v.<br><br>PUBLIC EMPLOYMENT RELATIONS BOARD,<br><br>Respondent;<br><br>UNITED TEACHERS LOS ANGELES,<br><br>Real Party in Interest. | No. B316745<br><br>(Super. Ct. No. LA-CE-6362-E through LA-CE-6366-E and LA-CE-6372-E through LA-CE-6377-E)<br>(Bernhard Rohrbacher, Judge) |

ORIGINAL PROCEEDING; petition for writ of extraordinary relief.  Bernhard Rohrbacher, Judge.  Petition affirmed.

Aclient, Robert A. Escalante; Sheppard, Mullin, Richter & Hampton, David A. Schwarz, Jay T. Ramsey, Alexandra M. Jackson for Petitioners.

J. Felix De La Torre, General Counsel, Wendi L. Ross, Joseph W. Eckhart and Jessica S. Kim, Regional Attorneys, for Respondent.

Altshuler Berzon, Scott A. Kronland, Matthew J. Murray and Juhyung Harold Lee for California Teachers Association, California Federation of Teachers, and Service Employees International Union California State Council as Amici Curiae on behalf of Respondent.

Bush Gottlieb, Ira L. Gottlieb, Erica Deutsch, Dexter Rappleye and Michael E. Plank for Real Party in Interest.

* * * * * *

Petitioners are 11 public charter schools (collectively, the Schools)[1] seeking to set aside a November 3, 2021 decision and order (Order) by respondent Public Employment Relations Board (PERB). In the Order, PERB found that the Schools violated section 3550 of the Prohibition on Public Employers Deterring or Discouraging Union Membership (PEDD) (Gov. Code,[2] §§ 3550–

---

[1]     The 11 schools are Alliance Marc & Eva Stern Math & Science High School, Alliance Ouchi-O'Donovan 6-12 Complex, Alliance Renee & Meyer Luskin Academy High School, Alliance College-Ready Middle Academy #10 also known as Alliance Leadership Middle Academy, Alliance Judie Ivie Burton Technology Academy High School, Alliance Collins Family College-Ready High School, Alliance Gertz-Ressler/Richard Merkin 6-12 Complex, Alliance Leichtman-Levine Family Foundation Environmental Science & Technology High School, Alliance College-Ready Middle Academy No. 5, Alliance College-Ready Middle Academy No. 8, and Alliance College-Ready Middle Academy No. 12.

[2]     All further statutory references are to the Government Code unless stated otherwise.

2

3553) and ordered the Schools, their governing boards, and their representatives to cease and desist from doing so. As originally enacted and as applicable here, section 3550 provided that "[a] public employer shall not deter or discourage public employees from becoming or remaining members of an employee organization." (Stats. 2017, ch. 567, § 1.)[3]

PERB concluded that e-mail communications by the Schools' management organization, Alliance College-Ready Public Schools (Alliance CMO), and by principals and assistant principals at eight of the Schools tended to influence School employees' decision whether to be represented by real party in interest United Teachers Los Angeles (UTLA), in violation of section 3550. PERB further concluded the Schools could be held responsible for those violations.

The Schools contend PERB's interpretation of section 3550[4] is erroneous because it eliminates longstanding free speech defenses under federal and California law for noncoercive employer speech. The Schools further contend section 3550 is facially unconstitutional because it violates free speech protections afforded by the federal and California Constitutions and is unconstitutional as applied to the communications at

---

[3] Section 3550 was amended, effective June 27, 2018. (Stats. 2018, ch 53, § 11.) Because the alleged violations at issue occurred before June 27, 2018, the original version of section 3550 applies.

[4] PERB in its decision applied section 3550 as amended in 2018 rather than the version of the statute as originally enacted. For purposes of our analysis, there is no substantive difference between section 3550 as originally enacted or as amended in 2018.

3

issue. Finally, the Schools challenge the sufficiency of the evidence supporting PERB's finding that Alliance CMO and the principals and assistant principals acted on behalf of the Schools when they e-mailed School employees about possible representation by UTLA.

PERB and UTLA maintain that PERB's interpretation of section 3550 is not clearly erroneous, and this court must defer to and uphold that interpretation. As to the Schools' constitutional claims, PERB and UTLA contend the Schools are political subdivisions of the State of California and as such cannot assert free speech claims against the state under the federal or California Constitutions. PERB and UTLA further argue that the communications at issue constitute government speech unprotected by the First Amendment, that the Schools waived any free speech rights they now seek to assert, and that PERB properly held the Schools responsible for communications by the administrators and Alliance CMO. PERB in addition argues that section 3550 is a permissible regulation of the Schools' speech as part of the public school program funded by the state.

PERB's interpretation of section 3550 is not clearly erroneous, and we therefore uphold that interpretation while we reject the Schools' constitutional claims. Although the Schools are not political subdivisions of the state and are not barred from asserting their free speech claims in this case, section 3550 is not facially unconstitutional because it regulates only government speech unprotected by the free speech provisions of the First Amendment and the California Constitution. Section 3550 is not unconstitutional as applied. The communications by School administrators and by Alliance CMO were made not as private citizens but pursuant to official and contractual duties as School

4

administrators. Those communications accordingly were not private speech but government speech unprotected by constitutional free speech provisions. Given our conclusion that section 3550 regulates only government speech, we do not address PERB's argument that the statute is a permissible regulation of the Schools' speech as part of a government funded public education program. Substantial evidence supports PERB's finding that Alliance CMO's and the School administrators' communications are attributable to the Schools under theories of actual and apparent authority. For the foregoing reasons, we affirm the Order.

## FACTUAL BACKGROUND

### The parties

#### *The Schools*

The Schools are chartered by the Los Angeles Unified School District. At the times relevant to this action, the Schools were incorporated and operated as separate nonprofit public benefit corporations under California's Nonprofit Public Benefit Corporation Law. (Corp. Code, § 5110 et seq.) Each has separate articles of incorporation and bylaws.[5]

#### *Alliance CMO*

Alliance CMO is a nonprofit public benefit corporation that contracted with the Schools to provide certain services, including human resources and employee relations.

---

[5] On January 1, 2020, each of the nonprofit corporations that operated the Schools merged with Alliance CMO, who has been added as a party to this appeal.

5

### PERB

PERB is the agency empowered by the Legislature to adjudicate unfair labor practice claims under several public employment relations statutes. (*Boling v. Public Employment Relations Bd.* (2018) 5 Cal.5th 898, 912 (*Boling*).) PERB also has exclusive initial jurisdiction to adjudicate alleged violations of section 3550. (§ 3551, subd. (a).)

### UTLA

UTLA is an employee organization within the meaning of PEDD section 3552, subdivision (a). It has been organizing the Schools' educators since 2015. On May 2, 2018, UTLA filed representation petitions seeking to represent employees at two of the Schools.

## E-mail communications

### Alliance CMO's e-mails

Between March 22, 2018, and May 1, 2018, Alliance CMO sent four e-mail communications to staff employed at the Schools. The contents of the e-mails are undisputed and are included in full in the Order. They are summarized in relevant part below.

#### March 22, 2018 e-mail

The March 22, 2018 e-mail stated that Alliance CMO had received complaints from some staff members about UTLA organizers contacting them at their homes. The e-mail advised staff that if they did not want a UTLA representative to visit their homes they could send a written request to UTLA. The e-mail offered a downloadable "Do Not Disturb" door hanger.

#### April 26, 2018 e-mail

The April 26, 2018 e-mail advised staff that the consequences of providing their signatures to a union organizer included "<u>signing on with a vehemently anti-charter union</u>";

6

paying $1,000 in annual dues, a "significant portion" of which would be "used to support anti-charter legislation, lobbying and elected officials"; and "**bypass[ing] a secret ballot election**" with "no open, transparent discussion among Alliance educators about what is best for Alliance scholars and staff."

*April 27, 2018 e-mail*

The April 27, 2018 e-mail asked, "**Will your union dues bail out UTLA's budget deficit?**"  It pointed out that with sufficient employee signatures, UTLA could obtain $650,000 in dues from School educators.  Under a heading captioned, "**UTLA'S FUNDING OF ANTI-CHARTER LEGISLATION**" the e-mail stated:  "About 50% of UTLA dues are paid to affiliate unions in Sacramento and Washington, DC, including paying for political contributions that support anti-charter laws and candidates."

*May 1, 2018 e-mail*

Under the caption, "**WHAT DO YOU GET BY PAYING UTLA $1,000 EVERY YEAR?  UTLA DUES GUARANTEE VERY LITTLE**," the May 1, 2018 e-mail stated:  "Despite what UTLA might say to you, they cannot guarantee you increased compensation, a different evaluation system or any other specific benefits or working conditions.  The results of collective bargaining may be the same, better, or worse than currently exist."

Under a second caption titled, "**PAY UTLA FOR POTENTIALLY LESS THAN YOU HAVE NOW**," the May 1, 2018 e-mail stated:

"Alliance teachers and counselors earn more than their peers represented by UTLA in LAUSD schools."

"The average Alliance class size is smaller than the class size written into UTLA's LAUSD contract."

"Alliance student to counselor ratio is 150:1 vs. the 'goal' of 500:1 in UTLA's LAUSD contract."

***E-mail messages from School principals and assistant principals***

In April and May 2018, several School principals and/or assistant principals used their School e-mail accounts to send e-mails to their staff. The e-mails were sent either before or after regular school hours. In nearly all cases, the e-mails included the senders' titles as principal or assistant principal of their respective schools. Several e-mails advised staff that UTLA had a history of opposing charter schools and sponsoring or supporting legislation that would adversely affect charter schools. Some principals recounted their experiences as former union members. One principal described the "negative culture" at a union meeting. Another stated that UTLA "did not help me become a better teacher, did not help my students become better behaved or better educated and they certainly did not give me more 'voice' or 'clout' at my school or in district-level decision making."

Some e-mails asserted that UTLA's organizing efforts were causing dissension and division in the Schools, accused UTLA organizers of harassing teachers, suggested that unionization would adversely affect the Schools and their students and could cause staff to leave the Schools. Two e-mails contained identical language, although they came from administrators at different schools.

## PROCEDURAL HISTORY

### Complaints and administrative hearing

On June 4, 2018, UTLA filed unfair labor practice charges against the Schools. PERB issued complaints alleging that the Schools violated PEDD section 3550 as well as section 3543.5, subdivisions (a) and (b), of the Educational Employment Relations Act (EERA) (§ 3540 et seq.),[6] when Alliance CMO and School administrators sent anti-union messages to School employees. The complaints were consolidated and assigned to an administrative law judge (ALJ).

The parties stipulated to evidence submitted to the ALJ, including the e-mails sent by Alliance CMO and the principals and assistant principals, the Schools' charter renewal petitions, and the administrative services agreements between Alliance CMO and the Schools.

After a two-day hearing, the ALJ issued a proposed decision dismissing the allegations regarding the Schools' e-mail messages. Applying PERB decisional law regarding speech alleged to interfere with employee rights, the ALJ found the messages did not violate EERA section 3543.5 because they did not contain "threats of reprisal or force or promises of benefit" required to establish unlawful interference under EERA. In the absence of a PERB decision interpreting then-recently enacted section 3550, the ALJ interpreted that statute's bar on deterring or discouraging public employees from union membership as reiterating existing prohibitions under EERA against

---

[6] The EERA violations are not at issue in this appeal.

9

employer reprisals, threats, discrimination, restraint, coercion, or interference with an employee's right to join and be represented by a union. The ALJ then concluded the e-mail messages did not violate section 3550. UTLA and the Schools filed exceptions to the ALJ's proposed decision.

**PERB's *Regents I* and *Regents II* decisions**

While the parties' exceptions were pending, PERB issued its first decisions interpreting section 3550. In *Regents of the University of California* (2021) PERB Dec. No. 2755-H (*Regents I*), PERB concluded that section 3550 does not duplicate interference prohibitions in existing statutes. (*Regents I,* at p. 28.) PERB reasoned that section 3550 "uses new and broader language than prior law" (*Regents I,* at p. 30) and that the legislative history "indicates the Legislature's desire to afford special protection to employee decisions regarding union selection, membership, and support" (*id.* at p. 32). PERB concluded that section 3550 prohibits conduct that "tends to influence employee choices as to *whether or not* to authorize representation." (*Regents I,* at p. 25.)

PERB applied an objective, burden-shifting test for determining whether conduct or communication deters or discourages employees from making the choices enumerated in section 3550: "It is the charging party's burden to show that the conduct or communication tends to influence employee free choice, not that the conduct actually did influence employee choice. We will look first to the conduct or communication itself in determining whether it tends to influence employee free choice. But

10

context matters in even the objective assessment. Therefore, we also will examine the context surrounding the conduct or communication when determining whether such conduct is reasonably likely to deter or discourage employee choices on union matters." (*Regents I, supra*, PERB Dec. No. 2755-H at p. 24.) When a charging party meets this burden, PERB determined "the burden then shifts to the employer to plead and prove a business necessity as an affirmative defense." (*Regents of the University of California* (2021) PERB Dec. No. 2756-H, p. 7 (*Regents II*); see *Regents I*, pp. 35–36.)

After *Regents I* and *Regents II* were issued, PERB requested further briefing from the parties in this case. Each side submitted a supplemental brief.

**Order**

PERB found the Schools violated section 3550 as alleged in the complaints. PERB concluded the Schools were liable for Alliance CMO's messages under theories of actual authority, apparent authority, and ratification, and for the Schools' administrators' messages under theories of actual and apparent authority. Applying the *Regents I* standard, PERB found the messages sent by Alliance CMO and School administrators violated section 3550 because they tended to influence employee choice by "sowing fear and distrust of unionization, the collective bargaining process, and UTLA specifically." PERB rejected the Schools' various defenses, including whether they established a business necessity for entering the debate as to whether employees should authorize unionization by

11

UTLA, and whether that necessity outweighed the tendency to influence employees.

**Petition for writ of extraordinary relief, petition for review, and order to show cause**

The Schools filed a petition for writ of extraordinary relief from the Order. After this court summarily denied the petition, the Schools filed a petition for review in the California Supreme Court. On November 15, 2023, the Supreme Court granted the petition and transferred the matter back to this court pursuant to California Rules of Court, rule 8.528(d), with directions to vacate the order denying extraordinary relief and to issue an order directing PERB to show cause why the relief sought in the Schools' petition should not be granted.

Pursuant to the Supreme Court's November 15, 2023 order, this court issued an order directing PERB to show cause why the relief sought in the Schools' petition for extraordinary relief should not be granted. In response, PERB filed a letter brief stating that the relevant arguments were set forth in full in its opposition to the Schools' writ petition. The Schools also filed a letter brief asking this court to consider briefing submitted by the parties in the Schools' petition for review in the California Supreme Court.

12

**DISCUSSION**

**I.      Applicable legal framework**

**A.      *California public employee labor relations laws***

The public policy of California is expressly declared to be in favor of labor organization.  (Lab. Code, § 923.)[7]  To further that policy, the California Legislature has enacted a series of statutes granting public employees organizational and negotiating rights analogous to those accorded to private sector employees under federal labor relations laws.  (*Teamsters Local 2010 v. Regents of University of California* (2019) 40 Cal.App.5th 659, 668 (*Teamsters Local 2010*).)  Certain of those statutes are relevant to our analysis of the issues presented here.

---

[7]      Labor Code section 923 states in part:  "[T]he public policy of this State is declared as follows:  [¶]  Negotiation of terms and conditions of labor should result from voluntary agreement between employer and employees.  Governmental authority has permitted and encouraged employers to organize in the corporate and other forms of capital control.  In dealing with such employers, the individual unorganized worker is helpless to exercise actual liberty of contract and to protect his freedom of labor, and thereby to obtain acceptable terms and conditions of employment.  Therefore it is necessary that the individual workman have full freedom of association, self-organization, and designation of representatives of his own choosing, to negotiate the terms and conditions of his employment, and that he shall be free from the interference, restraint, or coercion of employers of labor, or their agents, in the designation of such representatives or in self-organization or in other concerted activities for the purpose of collective bargaining or other mutual aid or protection."

13

1.  *EERA*

EERA accords public school employees the right to join labor organizations of their choice and to be represented by such organizations in their employment relationships with their public school employers.  (§ 3543.)  EERA section 3540 states the Legislature's intent in this regard as follows:  "It is the purpose of this chapter to promote the improvement of personnel management and employer-employee relations within the public school systems in the State of California by providing a uniform basis for recognizing the right of public school employees to join organizations of their own choice, to be represented by the organizations in their professional and employment relationships with public school employers, to select one employee organization as the exclusive representative of the employees in an appropriate unit, and to afford certificated employees a voice in the formulation of educational policy."

EERA section 3543.5, subdivision (a) makes it unlawful for public school employers to impose or threaten to impose reprisals on employees, discriminate or threaten to discriminate against them, or to interfere with, restrain, or coerce employees because they exercise their right to join and be represented by a labor organization.

Section 3543.5, subdivision (b) makes it unlawful for a public school employer to deny employee organizations any of the rights guaranteed to them under EERA, including freedom from interference in forming or administering any employee organization.[8]

---

[8]     Section 3543.5 states in its entirety:

14

Although the language of section 3543.5, subdivision (b) does not mirror that of subdivision (a) and is not limited to employer reprisals, discrimination, interference, restraints, coercion, or threats against employees, PERB interprets the prohibitions set forth in both subdivisions (a) and (b) in a similar manner.  To establish a prima facie case under either subdivision, the charging party must demonstrate that the employer's conduct tends to or does result in harm to employee rights.  (*San Diego Unified School Dist.* (2019) PERB Dec.

---

"It is unlawful for a public school employer to do any of the following:

"(a) Impose or threaten to impose reprisals on employees, to discriminate or threaten to discriminate against employees, or otherwise to interfere with, restrain, or coerce employees because of their exercise of rights guaranteed by this chapter.  For purposes of this subdivision, 'employee' includes an applicant for employment or reemployment.

"(b) Deny to employee organizations rights guaranteed to them by this chapter.

"(c) Refuse or fail to meet and negotiate in good faith with an exclusive representative.  Knowingly providing an exclusive representative with inaccurate information, whether or not in response to a request for information, regarding the financial resources of the public school employer constitutes a refusal or failure to meet and negotiate in good faith.

"(d) Dominate or interfere with the formation or administration of any employee organization, or contribute financial or other support to it, or in any way encourage employees to join any organization in preference to another.

"(e) Refuse to participate in good faith in the impasse procedure set forth in Article 9 (commencing with Section 3548)."

15

No. 2634-E, p. 17; *Carlsbad Unified School District* (1979) PERB Dec. No. 89, p. 10.)  If the prima facie case is established, PERB balances the degree of harm to protected rights against any legitimate business interest asserted by the employer.

When engaging in the balancing analysis under section 3543.5, PERB applies free speech provisions found in title 29 United States Code section 158(c)[9] and federal case law to accord public school employers a safe harbor from EERA sanctions for expressing their views on employment matters, so long as such expression contains no threat of reprisal or force or promise of benefit.  (See, e.g., *California Virtual Academies* (2018) PERB Dec. No. 2584-E, p. 29.)  PERB has reasoned that "[w]hile this Board is aware that the EERA contains no provision paralleling title 29 United States Code section 158(c), we find that a public school employer is nonetheless entitled to express its views on employment related matters over which it has legitimate concerns in order to facilitate full and knowledgeable debate.  It is unreasonable to assume that the Legislature, by its omission, intended to restrict the public school employer from disseminating any views regarding the employment relationship once an employee organization appeared on the scene."  (*Rio Hondo Community College District* (1980) PERB Dec. No. 128-E, p. 19.)

---

[9]     Title 29 United States Code section 158(c) states:  "The expressing of any views, or argument, or opinion, or the dissemination thereof, whether in written, printed, graphic, or visual form, shall not constitute or be evidence of an unfair labor practice under any of the provisions of this Act, if such expression contains no threat of reprisal or force or promise of benefit."

16

**2.** *HEERA*

The Higher Education Employer-Employee Relations Act (HEERA) (§§ 3560–3599), accords employees of the University of California and California State University systems organizational and negotiating rights similar to those in EERA. PERB has initial jurisdiction to determine unfair labor practices under HEERA. (§ 3563.2.)

HEERA states that it is unlawful for a public higher education employer to "(a) [i]mpose or threaten to impose reprisals on employees, to discriminate or threaten to discriminate against employees, or otherwise to interfere with, restrain, or coerce employees because of their exercise of rights guaranteed by this chapter. . . . [¶] . . . [¶] (d) Dominate or interfere with the formation or administration of any employee organization . . . ." (§ 3571.)

HEERA section 3571.3 expressly codifies the safe harbor for non-coercive, non-threatening employer speech found in title 29 United States Code section 158(c) and applied by PERB under EERA: "The expression of any views, arguments, or opinions, or the dissemination thereof, whether in written, printed, graphic, or visual form, shall not constitute, or be evidence of, an unfair labor practice under any provision of this chapter, unless such expression contains a threat of reprisal, force, or promise of benefit; provided, however, that the employer shall not express a preference for one employee organization over another employee organization."

**3.** *PEDD*

The California Legislature enacted the PEDD in 2017. Unlike EERA and HEERA, which apply to public

school employers, the PEDD applies to all public employers. As originally enacted and as applicable here, section 3550 provided: "A public employer shall not deter or discourage public employees from becoming or remaining members of an employee organization." (Stats. 2017, ch. 567, § 1.)[10] Effective January 1, 2023, PERB may assess civil penalties against a public employer who violates the statute. (§ 3551.5.)

### B. *Charter Schools Act*

The Charter Schools Act of 1992 (CSA) (Ed. Code, § 47600 et seq.) created California's charter school system "to establish and maintain schools that operate independently from the existing school district structure" to accomplish a variety of educational goals. (Ed. Code, § 47601.) "For certain purposes, the [charter] school is 'deemed to be a "school district"' (*id.,* § 47612, subd. (c)), is 'part of the Public School system' (*id.,* § 47615, subd. (a)), falls under the 'jurisdiction' of that system, and is subject to the 'exclusive control' of public school officers (*id.,* § 47615, subd. (a)(2); see § 47612, subd. (a))." (*Wells v. One2One Learning Foundation* (2006) 39 Cal.4th 1164, 1186 (*Wells*).) Like other public schools, a charter school is eligible for

---

[10] The statute was subsequently amended, effective June 27, 2018, to state: "A public employer shall not deter or discourage public employees or applicants to be public employees from becoming or remaining members of an employee organization, or from authorizing representation by an employee organization, or from authorizing dues or fee deductions to an employee organization. This is declaratory of existing law." (Stats. 2018, ch. 53, § 11.) Because the e-mails at issue here were sent between March and May of 2018, the statute as originally enacted applies, rather than the 2018 amended version.

18

state and local public education funds.  A charter school's share of such funds is calculated primarily, as with all public schools, on the basis of its enrollment.  (Ed. Code, § 47612; *Wells*, at p. 1186.)

A charter school may elect to operate as a nonprofit corporation organized under the Nonprofit Public Benefit Corporation Law (Ed. Code, § 47604, subd. (a)) but must operate pursuant to the terms of its charter.  A charter school is exempt from many of the laws governing public school districts but must comply with the CSA and certain other specified laws, including, as relevant here, EERA and the PEDD.  (Ed. Code, §§ 47610, 47611.5, subd. (a); *Wells, supra,* 39 Cal.4th at p. 1186.)  The CSA requires school charters to contain a declaration asserting whether "the charter school shall be deemed the exclusive public school employer of the employees at the charter school for the purposes of Section 3540.1 of the Government Code."[11]  (Ed. Code, § 47611.5, subd. (b).)

The Schools each submitted a charter renewal petition to LAUSD stating that each school "is deemed the exclusive public school employer of all employees of the charter school for collective bargaining purposes.  As such, Charter School shall comply with all provisions of the Educational Employment Relations Act ('EERA'), and shall act independently from LAUSD for collective bargaining purposes.  In accordance with the EERA, employees may join and be represented by an organization of

_____

[11]    As relevant here, Government Code section 3540.1, subdivision (k) defines a "public school employer" as "the governing board of a school district, a school district, a county board of education" and "a charter school that has declared itself a public school employer pursuant to subdivision (b) of Section 47611.5 of the Education Code."

19

their choice for collective bargaining purposes."  In their charter renewal petitions, each school agreed to "comply with all applicable federal and state laws and regulations, and District policy as it relates to charter schools."

## II.     Statutory interpretation

### A.     *Applicable legal principles and standard of review*

PERB has initial exclusive jurisdiction to adjudicate unfair labor practice claims under the PEDD.  (§ 3551, subd. (a).)  "It is settled that '[c]ourts generally defer to PERB's construction of labor law provisions within its jurisdiction.  [Citations.]  ". . . PERB is 'one of those agencies presumably equipped or informed by experience to deal with a specialized field of knowledge, whose findings within that field carry the authority of an expertness which courts do not possess and therefore must respect.' [Citation.]"  [Citation.]  We follow PERB's interpretation unless it is clearly erroneous.  [Citation.]'  [Citation.] [I]nterpretation of a public employee labor relations statute "'falls squarely within PERB's legislatively designated field of expertise,'" dealing with public agency labor relations. Even so, courts retain final authority to "'state the true meaning of the statute.'"'"  (*Boling, supra,* 5 Cal.5th at pp. 911–912.)

When interpreting statutory language, PERB, as well as a reviewing court, must follow the fundamental rule to ascertain the intent of the Legislature to effectuate the purpose of the law.  (*People v. Murphy* (2001) 25 Cal.4th 136, 142; *Regents I, supra,* PERB Dec. No. 2755-H at p. 20.)

20

**B.** *PERB's interpretation of section 3550 is not clearly erroneous*

As originally enacted and as applicable here, PEDD section 3550 provided: "A public employer shall not deter or discourage public employees from becoming or remaining members of an employee organization." (Stats. 2017, ch. 567, § 1.) PERB interprets the words "deter or discourage" as used in section 3550 to mean "to tend to influence an employee's free choice regarding whether or not to (1) authorize union representation, (2) become or remain a union member, or (3) commence or continue paying union dues or fees." (*Regents I, supra,* PERB Dec. No. 2755-H at p. 21.)

In *Regents I*, PERB found section 3550 "sufficiently clear and unambiguous" to sustain its interpretation. (*Regents I, supra,* PERB Dec. No. 2755-H at p. 31.) PERB nevertheless found support for its interpretation in the overall statutory scheme of which the PEDD is a part, PERB decisional law, case law, and the legislative history behind section 3550.

PERB found "useful equivalents" of the terms "deter or discourage" in other labor relations statutes. (*Regents I, supra*, PERB Dec. No. 2755-H at p. 21.) Section 16645, subdivision (a), for example, which prohibits use of state funds or facilities to "assist, promote, or deter union organizing" defines those terms as follows: "'Assist, promote, or deter union organizing' means any attempt by an employer to influence the decision of its employees in this state or those of its subcontractors regarding either of the following: [¶] (1) Whether to support or oppose a labor

21

organization that represents or seeks to represent those employees.  [¶]  (2) Whether to become a member of any labor organization."

PERB found additional support for its interpretation in *Teamsters Local 2010, supra*, 40 Cal.App.5th 659.  The court in that case considered whether a bulletin circulated by the employer could reasonably be found to "deter" union organizing, in violation of section 16645.6.[12]  The court held that the phrase "assist, promote, or deter union organizing" as defined in section 16645 and used in section 16645.6 required only a showing of "'any attempt by an employer to *influence* the decision of its employees.'" (*Teamsters Local 2010*, at p. 666.)  The court rejected the employer's argument that noncoercive communications that do not constitute unfair labor practices under HEERA section 3571.3 also do not violate section 16645.6.  The court noted that "[a]lthough the bulletin was not coercive, in that [the employer] professed neutrality on the issue of unionization, couched the communication in terms of providing employees with facts, and did not threaten employees with reprisals if they unionized, a trier of fact could reasonably find the bulletin was an attempt to 'influence' the employees who were on the receiving end." (*Teamsters Local 2010*, at pp. 666–667.)

In *Regents I*, PERB noted that although the Legislature did not incorporate in section 3550 the

---

[12]     Section 16645.6, subdivision (a) states: "A public employer receiving state funds shall not use any of those funds to assist, promote, or deter union organizing."

definition of "deter" in section 16645, it chose to use the term "deter" in both statutes; sections 16645 and 3550 govern the same subject matter—employer conduct related to employee decisions regarding unions; and that generally, when the Legislature uses a word or phrase in a particular statute, the word or phrase should be understood to have the same meaning when used in another statute addressing the same subject matter. (*Regents I, supra*, PERB Dec. No. 2755-H at p. 23, citing *People v. Tran* (2015) 61 Cal.4th 1160, 1167–1168.)

PERB interprets the term "discourage" as used in section 3550 in a similar manner. Although "discourage" is not defined in any related law, PERB noted in *Regents I* that the term "encourage" appears in other statutes prohibiting employer conduct that could "'in any way encourage employees to join any organization in preference to another.'" (*Regents I, supra,* PERB Dec. No. 2755-H at pp. 23–24; see, e.g., §§ 3506.5, subd. (d), 3519, subd. (d), 3524.71, subd. (d), 3543.5, subd. (d), 3571, subd. (d).) PERB further noted that its decisions interpreting "encourage" as used in those statutes as "'whether the employer's conduct tends to influence'" employee choice one way or another is consistent with its interpretation of "discourage" in section 3550. (*Regents I, supra,* PERB Dec. No. 2755-H at p. 24.)

In *Regents I*, PERB concluded the PEDD provides public employers no safe harbor for noncoercive or nonthreatening speech similar to that found in HEERA section 3571.3. PERB reasoned that "the PEDD is in its own chapter separate from HEERA," "uses no language which duplicates the limitations of HEERA's free speech safe harbor," and does not reference the

HEERA safe harbor provision "explicitly or implicitly." (*Regents I, supra,* PERB Dec. No. 2755-H at p. 30.)

Applying its decision in *Regents I*, PERB found no safe harbor protection under the PEDD for the speech at issue here, despite the absence of any threat of reprisal, force, or promise of benefit.

In *Regents I*, PERB treated section 3550 "even-handedly as prohibiting public employer conduct which tends to influence employee choices as to *whether or not* to authorize representation, become or remain a union member, or commence or continue paying union dues." (*Regents I, supra*, PERB Dec. No. 2755-H at p. 25.) PERB reasoned that interpreting section 3550 to permit an employer to encourage employees to become or remain union members would conflict with the prohibition in HEERA section 3571, subdivision (d) against an employer "'encourag[ing]'" support for one union over another. (*Regents I*, at p. 26.)

PERB also found support for its interpretation in the legislative history for section 3550. A Senate Floor Analysis for Senate Bill No. 285, through which the Legislature enacted section 3550, notes that the bill "'essentially seeks to ensure that public employers shall remain neutral when their employees are deciding whether to join a union or to stay in the union.' (Sen. Rules Com., Off. of Sen. Floor Analyses, 3d reading analysis of Sen. Bill No. 285 (2017-2018 Reg. Sess.) as amended March 14, 2017, p. 4." (*Regents I, supra*, PERB Dec. No. 2755-H at p. 28.) PERB also relied on an Assembly Floor Analysis that quoted Senate Bill No. 285's author as stating that the

24

bill "'ensure[s] that public employees remain free to exercise their personal choice as to *whether or not to become union members*, without being deterred or discouraged from doing so by their employer.' (Assem. Com. on Public Employees, Retirement, and Social Security, Analysis of Sen. Bill No. 285 (2017-2018 Reg. Sess.) as amended March 14, 2017, p. 3, italics added.)" (*Regents I*, at p. 28.)

PERB's interpretation of section 3550 is not clearly erroneous. As set forth in detail in *Regents I* and summarized above, PERB's interpretation is consistent with the statutory scheme governing labor organization rights of public employees, case authority and PERB decisional law applying those statutes, and the legislative history underlying section 3550. Because PERB's interpretation of section 3550 is not clearly erroneous, we defer to and uphold that interpretation. (*Boling, supra*, 5 Cal.5th at p. 913.)

## III. The Schools' standing to assert their constitutional challenge

We reject PERB's and UTLA's contention that the Schools are political subdivisions of the State of California who cannot assert constitutional free speech claims against the state. It is settled that ""'[a] public school district is a political subdivision of the State of California'"" (*West Contra Costa Unified School Dist. v. Superior Court* (2024) 103 Cal.App.5th 1243, 1274, quoting *K.M. v. Grossmont Union High School Dist.* (2022) 84 Cal.App.5th 717, 752), and as such has "no privileges or immunities under the federal constitution which it may invoke in opposition to the will of its creator." (*Williams v. Baltimore* (1933) 289 U.S. 36, 40.) While the Legislature treats charter schools as

25

public school districts for certain purposes, it does not do so for all purposes. (*Wells, supra*, 39 Cal.4th at p. 1186.) There is no indication the Legislature intended charter schools to be deemed political subdivisions of the state for the purpose of restricting their ability to assert constitutional claims against the state.

The purposes for which a charter school is deemed to be a school district are statutorily delimited. Education Code section 47612, subdivision (c) specifies "how, and to what extent, and under which statutory provisions charter schools are deemed to be part of the system of public schools, or 'deemed to be a "school district."'" (*Los Angeles Leadership Academy, Inc. v. Prang* (2020) 46 Cal.App.5th 270, 278–279 (*Prang*).) That statute provides: "A charter school shall be deemed to be a 'school district' for purposes of Article 1 (commencing with Section 14000) of Chapter 1 of Part 9 of Division 1 of Title 1, Section 41301, Section 41302.5, Article 10 (commencing with Section 41850) of Chapter 5 of Part 24 of Division 3, Section 47638, and Sections 8 and 8.5 of Article XVI of the California Constitution." (Ed. Code, § 47612, subd. (c).) All of statutes specified in Education Code section 47612, subdivision (c) govern funding and allocation of state monies for support of the public school system and public institutions of higher education.[13] There is no indication the Legislature

_____

[13]     Title 1, division 1, part 9, chapter 1, article 1 of the Education Code governs sources, conditions for apportionments, and amounts of financial support for the public school system. Education Code section 41301 sets forth an allocation schedule for the State School Fund. Section 41302.5 states that "school districts" for purposes of funds allocated to the State School Fund "shall include county boards of education, county superintendents of schools, and direct elementary and secondary level

26

intended charter schools to be deemed school districts for purposes of asserting privileges or immunities under the federal or California Constitutions against the state.

It is true that charter schools are "part of the Public School System, as defined in Article IX of the California Constitution,"[14] (Ed. Code, § 47615, subd. (a)), fall under the "jurisdiction" of the public school system and the "exclusive control" of public school officers for purposes of section 8 of article IX of the California

instructional services provided by the state, including the Diagnostic Schools for Neurologically Handicapped Children . . . ." Section 41850 governs apportionments for home-to-school transportation and special education transportation. Section 47638 states that for purposes of allocating lottery funds, a charter school shall be deemed to be a school district.

Article XVI, sections 8 and 8.5 of the California Constitution govern funding priority from state revenues for support of the public school system and public institutions of higher education, and allocations of state revenues to the State School Fund for elementary, high school, and community college purposes, respectively.

[14] Article IX, section 6 of the California Constitution states that "[t]he Public School System shall include all kindergarten schools, elementary schools, secondary schools, technical schools, and State colleges, established in accordance with law and, in addition, the school districts and the other agencies authorized to maintain them. No school or college or any other part of the Public School System shall be, directly or indirectly, transferred from the Public School System or placed under the jurisdiction of any authority other than one included within the Public School System."

27

Constitution[15] (Ed. Code, §§ 47615, subd. (a)(2), 47612, subd. (a)), and may, like all public schools, receive state and local public education funds (Ed. Code, § 47612). (*Wells, supra*, 39 Cal.4th at p. 1186.) Charter schools, however, are exempt from many of the laws governing public schools and school districts. (Ed. Code, § 47610; *Wells*, at p. 1186.) Unlike a public school, "[a] charter school may elect to operate as, or be operated by, a nonprofit corporation organized under the Nonprofit Public Benefit Corporation Law." (*Wells,* at p. 1186.)

A charter school's ability to operate as a nonprofit corporation is a factor courts have found significant in distinguishing charter schools from public school districts for purposes of asserting certain privileges and immunities under California law. In *Wells, supra,* 39 Cal.4th at page 1200, our Supreme Court rejected several charter schools' claim that they were "entitled to any 'public entity' immunity enjoyed by their chartering districts" under the California False Claims Act (CFCA) (§ 12650 et seq.). The Supreme Court held that public school districts were not "persons" who could be sued under the CFCA but charter schools and their nonprofit corporate operators could be liable under the statute. Applying a "traditional rule of statutory construction" the court in *Wells* held that "absent express words to the contrary, governmental agencies" such as

---

[15] Article IX, section 8 of the California Constitution states: "No public money shall ever be appropriated for the support of any sectarian or denominational school, or any school not under the exclusive control of the officers of the public schools; nor shall any sectarian or denominational doctrine be taught, or instruction thereon be permitted, directly or indirectly, in any of the common schools of this State."

28

school districts "are not included within the general words of a statute." (*Wells*, at p. 1192.) That rule did not apply to the charter schools, however, because the CFCA expressly defines "persons" liable under the statute to include "corporations" and does not exempt corporations that operate charter schools under the CSA. (*Wells*, at p. 1192.)

The court in *Wells* concluded the charter schools were not exempt from liability "merely because such schools are deemed part of the public school system" (*Wells, supra*, 39 Cal.4th at p. 1179) and distinguished between charter schools and their chartering districts. "Though charter schools are deemed part of the system of public schools for purposes of academics and state funding eligibility, and are subject to some oversight by public school officials [citation], the charter schools here are *operated*, not by the public school system, but by distinct outside entities— which the parties characterize as nonprofit corporations—that are given substantial freedom to achieve academic results free of interference by the public educational bureaucracy." (*Id.* at pp. 1200–1201; see Ed. Code, § 47604, subd. (a).)

Applying *Wells*, the appellate court in *Prang, supra*, 46 Cal.App.5th 270, 281, similarly held that charter schools, unlike public school districts, are not exempt from property taxes and special assessments on property used for public education purposes. "*Wells* establishes that charter schools are operated 'by distinct outside entities'; the CSA assigns 'no . . . sovereign significance to charter schools or their operators'; and '[e]xcept in specified respects,' charter schools are exempt from the laws governing school districts." (*Id.* at p. 278.) The court in *Prang* further reasoned that in Education Code section 47612, subdivision (c), "the Legislature has specified precisely how, and

29

to what extent, and under which statutory provisions charter schools are deemed to be part of the system of public schools, or 'deemed to be a "school district"' [citation].  Notably absent is any suggestion that charter[] schools are to be treated like school districts for taxation purposes."  (*Prang*, at pp. 278–279.)

The Legislature's express delineation in Education Code section 47612, subdivision (c) as to "how, and to what extent, and under which statutory provisions charter schools are deemed to be part of the system of public schools, or 'deemed to be a "school district"'" (*Prang, supra*, 46 Cal.App.5th at p. 279) and case law distinguishing charter schools from public schools and public school districts persuade us that a charter school, unlike a public school district, is not a political subdivision of the state.  The Schools accordingly are not barred from asserting their free speech challenge to the PEDD under the federal and California Constitutions.

PERB cites several nonbinding, nonprecedential cases in which courts, applying charter school laws from other states, have concluded that a charter school is a political subdivision of the state.  The charter school laws in those states differ materially from the CSA, and we find the cited cases unpersuasive for that reason.  (See, e.g., *Nampa Classical Academy v. Goesling* (9th Cir. 2011) 447 F.Appx. 776, 777 [under Idaho statute that deemed a public charter school a "governmental entity" that "may sue or be sued . . . to the same extent and on the same conditions as a traditional public school district," charter school organized as a private nonprofit corporation was a political subdivision of the state that could not assert 1st Amend. claims against the state]; *Greater Heights Academy v. Zelman* (6th Cir. 2008) 522 F.3d 678, 680–681 [Ohio

statute establishes charter schools as political subdivisions and a private nonprofit corporation organized under Ohio charter school law is unable to assert 14th Amend. claim against Ohio superintendents of public schools]; *Reach Academy for Boys & Girls, Inc. v. Delaware Dept. of Educ.* (D.Del. 2014) 46 F.Supp.3d 455, 466 [Delaware statute providing that "'[a] charter school may sue or be sued to the same extent and on the same conditions as a public school district'" precluded charter school's constitutional claims against the state]; *First Philadelphia Preparatory Charter School v. Commonwealth Dept. of Educ.* (Pa. Commw. Ct. 2018) 179 A.3d 128, 140 [Pennsylvania statute providing that charter school can "'[s]ue or be sued, but only to the same extent and upon the same condition that political subdivisions and local agencies can be sued'" precluded charter school's 42 U.S.C. § 1983 claims against school district]; *Honors Academy, Inc. v. Texas Education Agency* (Tex. 2018) 555 S.W.3d 54, 64 [under Texas law, charter school is statutorily designated as a governmental entity unable to assert federal and state constitutional claims against the state].)  The CSA, unlike the charter school laws in other states, contains no provision declaring charter schools to be political subdivisions of the state or according charter schools the right to sue or be sued but only to the same extent as political subdivisions of the state.

Other courts, moreover, have concluded that a state's statutory characterization of a charter school as a "public school" is not dispositive as to whether the school is a state actor rather than a private entity.  In *Caviness v. Horizon Community Learning Center, Inc.* (9th Cir. 2010) 590 F.3d 806 (*Caviness*), for example, the Ninth Circuit rejected claims under title 42 United States Code section 1983 by a discharged teacher against an

Arizona public charter school that the school's false statements about him deprived him of his liberty interest in finding and obtaining work. The teacher argued that the charter school was a state actor that could be held liable under section 1983 because it was chartered and funded by the state, provided public education, participated in the state's retirement system, and was subject to state regulation in personnel matters. (*Caviness*, at pp. 815–818.) The Ninth Circuit noted that the case involved "the special situation of a private non-profit corporation running a charter school that is defined as a 'public school' by state law," and that "because the conduct of a private corporation is at issue, our inquiry does not end there." (*Id.* at p. 812.) The court explained that under section 1983, "'[s]tate action may be found if, though only if, there is such a close nexus between the State and the challenged action that seemingly private behavior may be fairly treated as that of the State itself.'" (*Caviness*, at p. 812.) The Ninth Circuit found no such nexus under the circumstances presented. (*Id.* at p. 818.)

Citing *Caviness*, the court in *Sufi v. Leadership High School* (N.D.Cal. 2013) 2013 WL 3339441 (*Sufi*) similarly rejected a similar title 42 United States Code section 1983 claim by a discharged administrator against a San Francisco charter school. The court in *Sufi* noted that the Arizona charter school statutes cited in *Caviness* were "very similar to those of California" and that neither California nor Arizona specifically designated charter schools as government entities. (*Caviness*, at p. *8.) The court in *Sufi* applied the Ninth Circuit's analysis in *Caviness,* found no "close nexus" between the state and the charter school's actions, and dismissed the plaintiff's section 1983 claims. (*Caviness*, at p. *8.)

32

Here, as in *Caviness* and *Sufi*, that state law deems charter schools to be public schools for some purposes does not make them governmental entities for all purposes. Because we conclude the Schools are not political subdivisions of the state for purposes of challenging the constitutionality of section 3550, we address their free speech claims.

## IV.   Constitutionality

In addressing the Schools' constitutional claims, a threshold issue arises concerning fact finding. The issue arises because PERB did not address the Schools' constitutional claims, as it had no authority to do so. (Cal. Const., art. III, § 3.5.)[16] PERB accordingly did not make fact findings specific to those claims. However, PERB did make factual findings concerning agency, which we determine in part V, *post*, of this decision are supported by substantial evidence. Those factual findings are also

---

[16]    Article III, section 3.5 of the California Constitution states: "An administrative agency, including an administrative agency created by the Constitution or an initiative statute, has no power:

"(a) To declare a statute unenforceable, or refuse to enforce a statute, on the basis of it being unconstitutional unless an appellate court has made a determination that such statute is unconstitutional;

"(b) To declare a statute unconstitutional;

"(c) To declare a statute unenforceable, or to refuse to enforce a statute on the basis that federal law or federal regulations prohibit the enforcement of such statute unless an appellate court has made a determination that the enforcement of such statute is prohibited by federal law or federal regulations."

33

relevant to our constitutional analysis. An appellate court, moreover, is empowered to make findings of fact, particularly where, as here, the parties have stipulated to evidence that is not in conflict. (Code Civ. Proc., § 909; *Diaz v. Professional Community Management, Inc.* (2017) 16 Cal.App.5th 1190, 1213.) We exercise our discretion to make such findings to the extent necessary to adjudicate the constitutional issues.

### A.    *Free speech rights and government speech*

The free speech clause of the First Amendment prohibits governmental entities and actors from "abridging the freedom of speech."[17] California's counterpart to the First Amendment's free speech provision is in article I, section 2 of the California Constitution, which states: "Every person may freely speak, write and publish his or her sentiments on all subjects . . . . A law may not restrain or abridge liberty of speech or press."

Free speech guarantees under the federal and California constitutions do not apply to government speech. (*Pleasant Grove City v. Summum* (2009) 555 U.S. 460, 467 (*Pleasant Grove*); *Delano Farms Co. v. California Table Grape Com.* (2018) 4 Cal.5th 1204, 1210–1211, 1244.) "The Free Speech Clause restricts government regulation of private speech; it does not regulate government speech." (*Pleasant Grove*, at p. 467.) "When government speaks, it is not barred by the Free Speech Clause

---

[17]    The free speech clause of the First Amendment states, "Congress shall make no law . . . abridging the freedom of speech." "[T]he Fourteenth Amendment makes the First Amendment's Free Speech Clause applicable against the States." (*Manhattan Community Access Corp. v. Halleck* (2019) 587 U.S. 802, 807.)

from determining the content of what it says." (*Walker v. Texas Div., Sons of Confederate Veterans, Inc.* (2015) 576 U.S. 200, 207.) "After all, the government must be able to 'promote a program' or 'espouse a policy' in order to function." (*Shurtleff v. City of Boston* (2022) 596 U.S. 243, 248, citing *Walker*, at p. 208.)

**B.** *Section 3550 regulates government speech*

The Schools' facial constitutional challenge to section 3550 must be rejected because the statute restricts only "government speech" unprotected by the First Amendment and the California Constitution. The plain language of section 3550 makes clear that it regulates only government speech. The statute, by its terms, applies only to a "public employer," defined in section 3552 to include public agencies (e.g., governmental subdivisions, cities, counties, municipal and public corporations), state employers, the superior courts and Judicial Council, the Regents of the University of California and the California State Universities, public transit districts, and public school employers (§ 3552, subd. (c))—all governmental entities. As relevant here, section 3550 also applies to "a charter school that has declared itself a public school employer pursuant to subdivision (b) of Section 47611.5 of the Education Code." (§ 3540.1, subd. (k).) In their respective charter renewal applications, each of the Schools declared itself to be deemed "the exclusive public school employer" for labor relations purposes within its school.

Because section 3550 applies only to public employers, the Schools' argument that the statute is an unconstitutionally overbroad form of viewpoint discrimination fails. The government "'is entitled to say what it wishes,' [citation], and to select the views that it wants to express . . . ." (*Pleasant Grove, supra*, 555 U.S. at pp. 467–468.) "It is the very business of

35

government to favor and disfavor points of view . . . ."  (*National Endowment for Arts v. Finley* (1998) 524 U.S. 569, 598 (conc. opn. of J. Scalia).)

The Schools' contention that section 3550 is unconstitutional as applied because it restricts their speech as private entities is also unavailing.  Permissible restrictions on government speech apply equally to private entities who are enlisted to convey the government's message.  (*Rosenberger v. Rector and Visitors of Univ. of Va.* (1995) 515 U.S. 819, 833 (*Rosenberger*) [government may "regulate the content of what is or is not expressed when it is the speaker or when it enlists private entities to convey its own message"].)  Although incorporated and operated as nonprofit public benefit corporations, the Schools are subject to section 3550 because they each have declared themselves to be a "public school employer" under Education Code section 47611.5, subdivision (b) and thereby agreed to the government-mandated obligations of public employers.  The Schools were not required to make such a declaration.  Education Code section 47611.5, subdivision (b) states that if a charter school does not declare itself to be an exclusive public school employer, "the school district where the charter is located shall be deemed the public school employer" for labor relations purposes.  (Ed. Code, § 47611.5, subd. (b).)  By declaring themselves to be exclusive "public school employers," the Schools, rather than the school district, became propagators of the state's message concerning their employees' right to join a labor organization.

The government speech doctrine also precludes the Schools' constitutional challenge on behalf of their principals and assistant principals and Alliance CMO.  Although "the First

Amendment's protections extend to 'teachers and students,' neither of whom 'shed their constitutional rights to freedom of speech or expression at the schoolhouse gate,'" "[n]one of this means the speech rights of public school employees are so boundless that they may deliver any message to anyone anytime they wish.  In addition to being private citizens, teachers and coaches are also government employees paid in part to speak on the government's behalf and convey its intended messages." (*Kennedy v. Bremerton School Dist.* (2022) 597 U.S. 507, 527 (*Kennedy*).)

When analyzing "the interplay between free speech rights and government employment," the United States Supreme Court applies a two-step inquiry.  (*Kennedy, supra,* 597 U.S. at p. 527.) "The first step involves a threshold inquiry into the nature of the speech at issue.  If a public employee speaks 'pursuant to [his or her] official duties,' [the Supreme Court] has said the Free Speech Clause generally will not shield the individual from an employer's control and discipline because that kind of speech is— for constitutional purposes at least—the government's own speech."  (*Ibid*.)  This same balancing analysis applies to independent contractors such as Alliance CMO.  (*Board of County Commissioners Wabaunsee County, Kansas v. Umbehr* (1996) 518 U.S. 668, 684–685.)  The plaintiff bears the threshold burden of demonstrating his speech was private speech, not government speech.  (*Kennedy*, at pp. 524, 529.)

When an employee "'speaks as a citizen addressing a matter of public concern,'" however, the Supreme Court has indicated "that the First Amendment may be implicated and courts should proceed to a second step.  [Citation.]  At this second step . . . courts should attempt to engage in 'a delicate balancing

37

of the competing interests surrounding the speech and its consequences.' [Citation.] Among other things, courts at this second step have sometimes considered whether an employee's speech interests are outweighed by "'the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees."'" (*Kennedy, supra*, 597 U.S. at p. 528.)

The School administrators' e-mail communications show that those communications were government speech, not private speech. Although the Schools argue the administrators' communications "were couched in the form of their personal opinions," the administrators' use of the School e-mail system rather than their personal e-mail accounts to communicate their views weighs against a determination that those communications were private rather than government speech. (See *Pleasant Grove, supra*, 555 U.S. at p. 467 [noting that the location where a message is displayed can affect the public's perception of who is speaking].) Nearly all of the administrators' e-mails include the sender's title as principal or assistant principal of the school. Many of the administrators' e-mails expressed concerns that unionization or the labor organizing process could adversely affect their school's operations. One principal, for example, wrote: "[M]y fear is that UTLA will negatively impact our unique school. I worry that they will impose rules like those they have created in their 400-page contract at LAUSD. I am worried that a UTLA contract at Ouchi or across Alliance will diminish the flexibility each of us has here—to the detriment of our students and our school."

Another principal echoed those concerns: "[M]any of the issues you have told me are pain points (i.e., being asked to meet

38

with an Administrator on a prep period, being asked to cover a class during a prep period, having a meeting scheduled during a pupil free day or prep period, conferencing with parents during a prep period, being asked to participate in a meeting after school, having to share classrooms, traveling teachers, class sizes exceeding 25, etc.) . . . are allowed for under this union-negotiated contract.  [¶]  Under UTLA, I worry that our ability to adapt to unique issues we are facing on our campus will be jeopardized as we will need to wait for negotiations to go to a collective bargaining table and be put into a contract before we can act."

One principal voiced concerns about losing teachers because of tensions caused by unionization efforts: "Unfortunately, several strong educators have recently indicated hesitation about returning next year despite having 100% of certificated staff originally say they intended to return a few months ago.  At the time of a teacher shortage, it would be detrimental for our scholars and community to lose experienced, heavily involved, Master teachers due to political tension among adults."

School operations such as those mentioned in the e-mails come within the scope of the principals' and assistant principals' official duties.  The Schools' respective charter renewal petitions state that while each school's board of directors and administrative staff share responsibility for "day-to-day operations of the Charter School, including, but not limited to, making necessary provisions for accounting, budgeting, payroll, purchasing, liability, insurance, and the like," "[a]ll management powers not specifically designated to the [school's] Board are delegated to the principal . . . ."  As the Supreme Court has explained, "when public employees make statements pursuant to

39

their official duties, the employees are not speaking as citizens for First Amendment purposes . . . ." (*Garcetti v. Ceballos* (2006) 547 U.S. 410, 421.)

That the principals' and assistant principals' e-mails were sent to employees under their supervision is a further indication that their statements were made pursuant to their official duties. As PERB found in its Order, the principals and assistant principals acted as their Schools' agents when they communicated with certificated employees under their supervision about labor issues affecting their Schools.

The Schools' argument that section 3550 impinges on their administrators' free speech rights as private citizens has been rejected by the Ninth Circuit in similar circumstances. In *Barke v. Banks* (9th Cir. 2022) 25 F.4th 714, several elected local government officials sought to assert a First Amendment challenge to section 3550, arguing that the statute violated their individual free speech rights by prohibiting speech based on its content. (*Barke*, at p. 718.) The Ninth Circuit rejected that argument, noting that "section 3550 does not regulate speech made by Plaintiffs in their individual capacities; the statute only impacts them to the extent their speech can be attributed to their 'public employer[s].' [Citation.] '[W]hen public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes,' and therefore restrictions on such speech do not implicate the employees' individual constitutional rights." (*Id.* at p. 719, quoting *Garcetti v. Ceballos, supra*, 547 U.S. at pp. 421–422.) We find the Ninth Circuit's reasoning to be persuasive and apply it here. Section 3550 does not restrict the School administrators'

40

speech as individuals, only statements made pursuant to their official duties.

Cases cited by the Schools do not support their position that the e-mail communications at issue were private speech. *Lindke v. Freed* (2024) 601 U.S. 187 (*Lindke*) involved social media posts by a city manager (Freed) on a Facebook page not designated as either "personal" or "official." Freed posted about both personal and job-related topics. He occasionally deleted unwelcome comments in response to those posts, including comments by Lindke, who complained about the city's response to the COVID-19 pandemic. Lindke filed an action under title 42 United States Code section 1983, alleging Freed had violated his First Amendment rights. The Supreme Court held that "a public official's social-media activity constitutes state action under §1983 only if the official (1) possessed actual authority to speak on the State's behalf, and (2) purported to exercise that authority when he spoke on social media." (*Lindke,* at p. 198.) Because section 1983 requires state action before a private person can be sued in in his individual capacity, the Supreme Court noted that "[c]ategorizing posts that appear on an ambiguous page like Freed's is a fact-specific undertaking in which the post's content and function are the most important considerations." (*Lindke*, at p. 203.) The Court further noted, however, that "[i]n some circumstances, the post's content and function might make the plaintiff's argument a slam dunk." (*Ibid.*)

Unlike *Lindke*, this case does not involve social media posts on an "ambiguous" Facebook page, but e-mail communications sent to School employees via the Schools' e-mail system. The e-mails indicate the senders' titles as principals or assistant principals of their schools and discuss the impact unionization

41

might have on school operations. The administrators possessed actual authority to speak on behalf of their respective Schools about school operations and labor issues affecting their schools, and the e-mail communications themselves indicate the administrators' intent to exercise that authority.

*Molloy v. Acero Charter School, Inc.* (N.D.Ill. 2019) 2019 U.S. Dist. Lexis 176797 *and Martinez v. Redwood City School Dist.* (N.D.Cal. 2021) 2021 U.S Dist. Lexis 46938, nonpublished federal court decisions cited by the Schools, are unpersuasive. The court in *Molloy* ruled that a charter school teacher's complaints to an outside staffing agency about the school's program for students with learning disabilities were made as a private citizen and not pursuant to her official duties and were therefore protected by the First Amendment. *Martinez* involved a community school coordinator's statements at a public meeting of the county board of supervisors, which the court found to be private speech. *Martinez* is distinguishable because it involved speech in a public forum, not the workplace. The speech at issue here, in contrast, was made by school administrators to their subordinates using their school e-mail accounts. The e-mails included the administrators' official titles as principals or assistant principals of their schools and discussed the potential impact of unionization on school operations.

The government speech doctrine also precludes the Schools' constitutional challenge on behalf of Alliance CMO, a private entity authorized to convey a public employer's message regarding labor relations matters. The administrative services agreements between Alliance CMO and the Schools specify that Alliance CMO's responsibilities include "[m]anag[ing] employee and grievance processes," and supporting the Schools "to ensure

42

compliance to federal, state, and local agencies and charter authorizer requirements."  By contractually delegating employee relations matters to Alliance CMO, the Schools authorized Alliance CMO to speak on their behalf regarding such matters. As an authorized speaker for a public school employer, Alliance CMO's communications on labor organizations constitutes government speech subject to government regulation. (*Rosenberger, supra*, 515 U.S. at p. 833.)

The Schools fail to sustain their burden of demonstrating the e-mail communications by School administrators and Alliance CMO constitute private speech, not government speech. (*Kennedy, supra,* 597 U.S. at pp. 524, 529.)  We therefore do not proceed to the second step of the *Kennedy* free speech inquiry to determine whether the administrators' and Alliance CMO's speech interests are outweighed by the interests of the state.  (*Id.* at p. 528.)

## V.    Agency

Alliance CMO and the School administrators challenge PERB's findings that they were the Schools' actual and apparent agents.  This challenge fails because substantial evidence supports the findings.

Agency may be established by showing the purported agent had actual or apparent authority to act on the employer's behalf, or that the employer ratified the purported agent's conduct.  (*City of San Diego* (2015) PERB Dec. No. 2464-M, pp. 38–39.)  The existence of an agency is a factual determination.  (*Inglewood Teachers Assn. v. Public Employment Relations Bd.* (1991) 227 Cal.App.3d 767, 780.)  We must accept PERB's factual findings, including ultimate facts, as conclusive if supported by

43

substantial evidence.  (*Id.* at p. 781.)  Under that standard, ""we do not reweigh the evidence.  If there is a plausible basis for [PERB's] factual decisions, we are not concerned that contrary findings may seem to us equally reasonable . . . .""" (*Boling, supra*, 5 Cal.5th at p. 912.)

"An agency is actual when the agent is really employed by the principal."  (Civ. Code, § 2299.)  "Actual authority is such as a principal intentionally confers upon the agent, or intentionally, or by want of ordinary care, allows the agent to believe himself to possess."  (Civ. Code, § 2316.)  Because an actual agent is employed by the principal, the primary inquiry in assessing actual authority is whether the agent was acting within the scope of his or her authority.  (*City of San Diego, supra*, PERB Dec. No. 2464-M at p. 15.)

Apparent authority is "such as a principal, intentionally or by want of ordinary care, causes or allows a third person to believe the agent to possess."  (Civ. Code, § 2317.)  "'Both PERB and the courts have held that apparent authority to act on behalf of the employer may be found where the manifestations of the employer create a reasonable basis for employees to believe that the employer has authorized the alleged agent to perform the act in question.'" (*Santa Ana Unified School Dist.* (2013) PERB Dec. No. 2332-E, pp. 9–10.)  Under some circumstances, employees may perceive their employer as responsible for the actions of subordinates, even without specific authorization or ratification by the employer. (*Compton Unified School Dist.* (2003) PERB Dec. No. 1518-E, p. 5, fn. 3 (*Compton*).)

The Schools argue on appeal, as they did below, that *Inglewood Unified School District* (1990) PERB Dec. No. 792 sets forth the proper test for apparent authority, requiring PERB to

establish justifiable reliance on the purported agent's conduct and a change in position resulting from that reliance. In its Order, however, PERB overruled *Inglewood* to the extent that decision requires a showing of justifiable reliance and a change of position by a party seeking to prove apparent authority and explained its reasons and authority for doing so.[18] The Schools do not challenge PERB's overruling of *Inglewood.*

Substantial evidence supports PERB's finding that Alliance CMO and the School administrators were the Schools' actual agents. Alliance CMO's contracts with the Schools expressly state that Alliance CMO will provide each school with human resources and employee relations services. As managerial employees, the principals and assistant principals were actual agents of the Schools that employed them. (*Chula Vista Elementary School Dist.* (2004) PERB Dec. No. 1647-E, p. 7; *Compton, supra*, PERB Dec. No. 1518-E, p. 5.)

Substantial evidence also supports PERB's findings that Alliance CMO acted within the scope of its actual and apparent authority when it sent the e-mail communications at issue to faculty and staff at the Schools. Alliance CMO's contracts with the Schools and the Schools' charter renewal petitions show that Alliance CMO acted within the scope of its authority. The Schools' charter renewal petitions specify the scope of Alliance CMO's authority as follows: "Alliance [CMO] also provides oversight and monitors adherence by [the Schools'] Board of

---

[18] PERB in the past has overruled its prior decisions when it has deemed appropriate to do so. (See, e.g., *County of Santa Clara* (2013) PERB Dec. No. 2321-M, p. 30, overruling, among other decisions, *Sylvan Union Elementary School Dist.* (1992) PERB Dec. No. 919-E.)

Directors to the charter process and any applicable law." Alliance CMO acted within the scope of its authority when it sent e-mails to School faculty and staff about UTLA's organization campaign—an employee relations matter governed by its contracts with the Schools and by EERA and the PEDD.

Substantial evidence further supports PERB's finding that the School administrators acted within the scope of their actual and apparent authority when they sent the e-mail communications at issue to faculty and staff. The Schools' charter renewal petitions expressly delegate to their principals all management powers not specifically designated to the School's board of directors. Many of the principals' e-mails discussed the potential impact of unionization on students, faculty, and school operations.

The Schools' charter renewal applications also show that principals and assistant principals are the highest ranking administrators at the Schools with supervisory authority over school staff. The School administrators used the Schools' e-mail system and their titles as principals and assistant principals of their respective schools to communicate with their subordinates about UTLA's organizing campaign and its effect on their respective schools. Given these circumstances, a reasonable employee would perceive the e-mails as expressing the Schools' view regarding UTLA's unionization efforts. (*Compton, supra*, PERB Dec. No. 1518-E at p. 5, fn. 3.)

Substantial evidence supports PERB's findings that the Schools may be held accountable under the PEDD for the e-mail communications at issue sent by Alliance CMO and School principals and assistant principals under theories of actual and apparent authority. We need not determine whether the Schools

may also be held responsible for those communications under the theory of ratification.

## DISPOSITION

PERB's November 3, 2021 decision and order is affirmed. PERB shall recover its costs on appeal.

_____
CHAVEZ, J.

We concur:

_____
LUI, P. J.

_____
HOFFSTADT, J.*

---

\*       Presiding Justice of the Court of Appeal, Second Appellate District, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.